IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

CASSANDRA HICKS,

     Plaintiff,

v.                          No. 14-1345

BENTON COUNTY BOARD OF
EDUCATION,

     Defendant.

_____

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
_____

## I.  INTRODUCTION

The Plaintiff, Cassandra ("Casey") Hicks, filed her initial complaint against the

Defendant, the Benton County, Tennessee, Board of Education ("BCBOE"), on December 22,

2014 (Docket Entry ("D.E.") 1), and an amended pleading on June 17, 2015 (D.E. 39).  She

alleged retaliation in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("§ 504");

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12203 ("ADA"); the First

Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983; and the Tennessee

Public Protection Act, Tennessee Code Annotated § 50-1-304 ("TPPA").  Plaintiff also averred

prior restraint of speech in violation of the First Amendment pursuant to § 1983.  Before the

Court is the Defendant's motion for summary judgment in accordance with Rule 56 of the

Federal Rules of Civil Procedure as to all the claims raised in this case.  (D.E. 64.)

## II.  STANDARD OF REVIEW

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view all evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in her favor. *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015).  "There is a genuine issue of material fact only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  "The test is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citing *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted).  The moving party must initially show the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party must then "present significant probative evidence to do more than show that there is some metaphysical doubt as to the material facts to defeat the motion." *Id.* (internal quotation marks omitted).

## III.  MATERIAL FACTS

Hicks worked as a special education teacher's aide/paraprofessional at Big Sandy School ("Big Sandy") in Benton County from the 2004-05 term until the end of the 2013-14 academic year.  According to BCBOE Policy 5.1037, teacher assistants are at-will employees, "with no expectation of continued employment, and their employment may be transferred, suspended, or dismissed by the Director [of Schools] in his/her sole and complete discretion at any time for any reason consistent with the efficient operation of the schools."  (D.E. 93-4 at PageID 4330; *see also* D.E. 93-3 at PageID 4327 (BCBOE Policy 5.1025) (same).)  These employees "may be

involved in the instructional program only if they are under direct supervision of a certificated teacher. They shall assist the teacher in achieving the objectives of the instructional program and shall perform such tasks as may be assigned by the teacher." (D.E. 93-4 at PageID 4330 (internal footnote omitted).)

Plaintiff's daughter, H.H., who, according to Hicks, functioned at or below a third-grade level, attended Benton County schools and, for at least some of that time, received special education services. Individualized Education Plans ("IEPs") were prepared for her by the school in the academic years 2010-11, 2011-12, 2012-13, 2013-14 and 2014-15. One item required under the 2013-14 IEP was a study guide for a tenth-grade biology class taught by Dawn Peach. The Plaintiff and her husband, Darrel Hicks, were dissatisfied with Peach's study guide or, rather, the lack thereof, and complained to her and others, including Big Sandy Principal Marty Caruthers and BCBOE Director of Schools Mark Florence.

The principal had begun to have issues with Hicks beginning in the 2012-13 academic year. During that term, she had conversations with a South American transfer student who had a boyfriend of whom her parents disapproved. After the girl moved out of their home and into that of Michelle Douglas, another special education teacher's aide who permitted her to see the boy, Hicks maintains that she answered questions from the child's parents concerning their daughter's general well-being. The parents, upset over the situation, apparently requested that Douglas be fired. Although the aide was not dismissed, it was Caruthers' stated belief that Douglas thereafter suffered from a hostile working environment because of Plaintiff's statements. According to Hicks, another incident occurred that year involving a severely handicapped student who was being abused at home. She stated in her affidavit filed contemporaneously with her response to the motion for summary judgment that she reported the abuse to Caruthers, who

had forbidden her to make direct reports to the Tennessee Department of Children's Services ("DCS"). He failed to pass the report on to the agency and the student later died.

Caruthers had problems with Hicks, as well as Douglas, into the 2013-14 term. On at least two occasions, he instructed them to cease talking to parents of special education students concerning what was going on in the program. It was his belief that the aides were informing parents that their children were not being served at the school. Hicks acknowledges that she spoke to special education parents about services their students failed to receive. Specifically, she told parents, in response to their questions, that she and Douglas were the only school employees supervising and making lesson plans for severely disabled students and that sensory items previously used as teaching aids had been removed from the premises, resulting in serious problems with the educational services being provided to these students during the 2013-14 year.

The principal advised Hicks and Douglas that, if a parent had a concern or question, they were to speak to the teacher first and then up the chain of command through him, Special Education Director Pam Chmelik and Florence. He cautioned that he would not tolerate turmoil, ongoing drama and conflict and, if such communication continued, would seek immediate termination of the offending parties. The principal prepared a memorandum in which he stated that Florence had contacted him and expressed concern about the situation. He added that the director of schools asked him to "reiterate to you that you are at will employees. In other words you are not a contracted employee." (D.E. 65-8 at PageID 2641.)

In an email dated December 14, 2013, Mr. Hicks sought assistance from Tennessee Education Complaint Investigator Kay Flowers concerning the study guide issue. (D.E. 65-4 at PageID 2216.) On March 6, 2014, the Plaintiff and her husband filed a formal administrative complaint with the Tennessee Department of Education Division of Special Education on behalf

of their daughter against Big Sandy. The stated grounds for the complaint were as follows: "She is not being giv[e]n a study guide for Biology. Her IEP stat[e]s that she is to have a study guide for her classes, especially [Biology]." (*Id.* at PageID 2215.)

On or about May 1, 2014, the principal, in a letter addressed to Florence, recommended that Plaintiff not be rehired for the 2014-15 academic year. The correspondence contained no reason for the recommendation. The director of schools accepted the recommendation and, in a letter dated May 16, 2014, the BCBOE notified Hicks of its decision not to renew her employment.

## IV. ASSERTIONS OF THE PARTIES AND LEGAL ANALYSIS

### A. Federal Claims

As noted above, the Plaintiff has asserted claims in accordance with federal law for violation of the ADA, § 504 and, pursuant to § 1983, her rights under the First Amendment. The Court will address those claims seriatim.

#### 1. Section 1983

(a)     The Statute Generally

Section 1983 provides a private right of action against any person who subjects "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights[ or] privileges . . . secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *Rehberg v. Paulk*, 132 S. Ct. 1497, 1501 (2012). The statute "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001) (citing *Okla. City v. Tuttle*, 471 U.S. 808 (1985)). A plaintiff suing under the statute must demonstrate the denial of a

constitutional right caused by a defendant acting under color of state law. *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014).

    (b)    Municipal Liability

A political body or subdivision, including a county board of education, is a "person" within the meaning of § 1983 and, therefore, may be subject to liability in actions brought thereunder. *See Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008); *Doe v. Claiborne Cty., Tenn. by & through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 505 (6th Cir. 1996). A municipal defendant may only be liable under § 1983, however, "if a custom, policy, or practice attributable to the municipality was the moving force behind the violation of the plaintiff's constitutional rights." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 685 (6th Cir. 2016) (quoting *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)) (internal quotation marks omitted), *reh'g en banc denied* (Nov. 15, 2016). *Respondeat superior* or vicarious liability will not establish a claim for damages against a municipality under § 1983. *Garner v. Harrod*, ___ F. App'x ___, 2016 WL 3774062, at *4 (6th Cir. July 15, 2016). A plaintiff may establish a policy or custom through reference to: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision[]making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

The BCBOE insists that the Plaintiff has failed to establish the existence of a custom or policy of unconstitutional activity and, instead, has shown merely that it employed Caruthers, the alleged tortfeasor. By way of response, Hicks invokes the second approach identified in *Thomas*. In order for the actions of an official such as a public school principal to impose

liability on the municipality, the decisionmaker must have "final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Whether an official had final policymaking authority is a question of state law. *Id.* at 483. Therefore, in determining liability of the BCBOE under § 1983, the "court's task is to identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional . . . violation at issue." *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 784-85 (1997) (internal quotation marks omitted); *Click v. Thompson*, 17 F. Supp. 3d 655, 660 (E.D. Ky.), *appeal dismissed* (6th Cir. Aug. 5, 2014).

The Plaintiff argues in her responsive brief that Caruthers possessed final policymaking authority with respect to developing school policy and directing aspects of staff/teacher employment, not including hiring and firing.[1] This is true if his decisions were "final and unreviewable and [were] not constrained by the official policies of superior officials," *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013), *reh'g & reh'g en banc denied* (June 18, 2013), or if he had "unfettered discretion," *Monistere v. City of Memphis*, 115 F. App'x 845, 852-53 (6th Cir. 2004).

Under Tennessee law, a school principal is to

(1) [s]upervise the operation and management of the personnel and facilities of the school or schools of which the principal is principal as the local board of education determines; (2) [a]ssume administrative responsibility and instructional leadership under the supervision of the director of schools and in accordance with the written policies of the local board of education for the planning, management, operation and evaluation of the education program of the schools to which assigned; (3) [s]ubmit recommendations to the director of schools regarding the appointment and dismissal of all personnel assigned to the school or schools under the principal's care, and make decisions regarding the specific duties of all

---

[1] Plaintiff concedes that Florence, as director of schools, had the ultimate authority to hire and fire teacher's aides.

personnel assigned to the school or schools under the principal's care; provided, that the duties of teachers shall be within their area of licensure and consistent with the policies, rules or contracts of the board of education; . . . (5) [p]erform such other duties as may be assigned by the director of schools pursuant to the written policies of the local board of education [and] (7)(A) [a]ssign educational assistants to noninstructional supervision of students . . .

Tenn. Code Ann. § 49-2-303(b)(1)-(3), (5), (7)(A). Hicks submits that the BCBOE authorized final decisionmaking by school principals by virtue of its Policy 5.1025, which provides that "[t]he school principal is the immediate supervisor of . . . aides." (D.E. 93-3 at PageID 4328.) However, § 49-2-303(b)(1) imposes upon the principal the duty of supervision over school personnel only "as the local board of education determines." Tenn. Code Ann. § 49-2-303(b)(1). Thus, it does not appear to the Court that Caruthers' supervision of teacher's aides was, under state law, final, unreviewable, unconstrained by the official policies of superior officials, or unfettered. BCBOE Policy 5.1023, entitled "Duties and Performance Contract of Principals," tracks the language of § 49-2-303(b)(1), permitting the principal to "supervise the operation and management of the personnel . . . of the school . . . of which he/she is principal *as the local board of education shall determine.*" (D.E. 93-2 at PageID 4325 (emphasis added).) The policy provides, as Hicks points out, for the added responsibility of principals to "hold regular meetings of the professional staff for the purpose of developing and coordinating school policies." (*Id.*) This directive does not, as Plaintiff suggests it must, convince the Court that the principal's decisionmaking authority with respect to the development of policy on the issues raised in this case is final and unfettered. The Court's view is bolstered somewhat by the policy's catch-all provision stating that the principal is "[t]o perform other responsibilities *as assigned by the Director of Schools.*" (*Id.* at PageID 4326 (emphasis added).)

A district court in this Circuit specifically applied § 49-2-303(b) in *Doe v. Farmer*, No. 3:06-0202, 2009 WL 3768906 (M.D. Tenn. Nov. 9, 2009). Therein, a high school physical

education teacher had a sexual relationship with a student. *Farmer*, 2009 WL 3768906, at *1. The school district's sexual harassment policy required that, upon receipt of a report, the principal was to notify the district's human rights officer, who would then appoint an official to investigate the complaint. *Id.* at *3. The principal became aware of the situation but did not inform school district officials. *Id.* In ruling on the school district's motion for summary judgment, the district court concluded that the principal, based on the language of § 49-2-303(b)(2), lacked the unfettered discretion to deal with instances of sexual abuse. *Id.* at *12. Rather, he was required to follow district policy. *Id.* As he failed to do so, the school district bore no liability. *Id.*

Upon review of Tennessee law and the BCBOE policies cited by the Plaintiff, the Court finds that she has failed to demonstrate that Caruthers' authority over the aspects of her employment, not including hiring and firing, was final and unreviewable, and not constrained by the official policies of superior officials. Nor does it find that he was granted unfettered discretion in these areas. Indeed, the *Farmer* court observed that "courts often find that principals lack the authority to expose school districts to § 1983 liability." *Id.*; *see also Pendleton v. Fassett*, Civil Action No. 08-227-C, 2009 WL 2849542, at *9-11 (W.D. Ky. Sept. 1, 2009) (in § 1983 action involving alleged unreasonable searches of alternative high school students by local police for contraband, claim of municipal liability could not survive summary judgment where plaintiff made no legal argument, and no showing, as to why the school principal, who was aware of the incidents, would have possessed final decisionmaking authority as to searches of students, even though he testified in his deposition that he would have been one who might address issues arising at the school).

Based on the foregoing, the Court concludes that, to the extent Plaintiff's federal claims are grounded in the actions of Caruthers as a final policymaker for the municipality, they are DISMISSED.

Hicks also seeks to impose liability upon the BCBOE through the fourth approach enumerated in *Thomas,* contending that Defendant had a custom of tolerating and acquiescing to violations of First Amendment rights as Florence was, it is alleged, aware of and condoned Caruthers' actions relative to Hicks' IEP and program complaints. This assertion must also fail. Where a plaintiff avers a custom of ignoring constitutional violations, the Sixth Circuit has required her to show "(1) a clear and persistent pattern of misconduct, (2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval of the misconduct, and (4) a direct causal link to the violations." *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015) (citing *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007)) (internal quotation marks omitted). A pattern of misconduct cannot be demonstrated "from the mistreatment of the plaintiff," as to do so "risks collapsing the municipal liability standard into a simple *respondeat superior* standard." *Id.* (alterations omitted). Here, Hicks has cited to no evidence that a pattern of retaliation by the BCBOE against employees for speaking out about conditions at the school existed at Big Sandy. Accordingly, her claims against the Defendant cannot be based upon a theory of a custom of tolerance of or acquiescence to federal rights violations.

(c)     Constitutional Violations under the First Amendment

Before delving into the nuts and bolts of the constitutional claims, the Court notes that, although Defendant purports to seek summary judgment as to all issues raised in this case, the dispositive motion contains no argument concerning the merits of Plaintiff's First Amendment

prior restraint claim.  The Court assumes the reason for this omission is the BCBOE intended for its assertion that Caruthers' actions could not bind the municipality to dispose of the claim.  In light of the Court's determination concerning the principal, the Plaintiff is DIRECTED to advise the Court within ten days of the entry of this order whether she intends to continue to pursue relief for prior restraint of speech.  The Court will then consider whether additional briefing is warranted.  If the Court does not receive advice from counsel within the allotted time period, it will deem the claim abandoned.

At this point, the Court turns to Hicks' claim of First Amendment retaliation.  It is assumed for purposes of this discussion, because Florence appears to have possessed final authority over hiring and firing of teacher's aides, that municipal liability may exist as to this claim.  A claim of retaliation under § 1983 requires proof of three elements:  "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct."  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016) (alteration omitted).

In this case, the protected conduct arises under the First Amendment, which provides that "Congress shall make no law  . . . abridging the freedom of speech."  U.S. Const. am. I; *Heffernan v. City of Paterson, N.J.,* 136 S. Ct. 1412, 1418 (2016).  "[P]ublic employers may not condition employment on the relinquishment of constitutional rights."  *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014); *see also Holbrook v. Dumas*, ___ F. App'x ___, 2016 WL 4376428, at *3 (6th Cir. Aug. 17, 2016) (same).  As the United States Supreme Court noted in *Lane,*

> [t]here is considerable value . . . in encouraging, rather than inhibiting, speech by public employees[, f]or government employees are often in the best position to know what ails the agencies for which they work.  The interest at stake is as much

> the public's interest in receiving informed opinion as it is the employee's own
> right to disseminate it.

*Lane*, 134 S. Ct. at 2377 (internal alterations, citations & quotation marks omitted).

On the other hand, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* The First Amendment "does not empower [public employees] to constitutionalize the employee grievance." *Holbrook*, 2016 WL 4376428, at *3 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)) (internal quotation marks omitted).

The United States Supreme Court's decision in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968), provided a framework for balancing "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In 2006, in *Garcetti*, the Court devised a two-step inquiry:

> The first requires determining whether the employee spoke as a citizen on a
> matter of public concern. If the answer is no, the employee has no First
> Amendment cause of action based on his or her employer's reaction to the speech.
> If the answer is yes, then the possibility of a First Amendment claim arises. The
> question becomes whether the relevant government entity had an adequate
> justification for treating the employee differently from any other member of the
> general public.

*Garcetti*, 547 U.S. at 418 (internal citations omitted).

In subsequent cases, the so-called *Pickering* balancing test has been stated thusly: to support a finding that her speech was protected, the public employee must establish that

> (1) [s]he was speaking as a private citizen, rather than pursuant to [her] official
> duties; (2) [her] speech involved a matter of public concern, and (3) [her] interest
> in commenting on the matter outweighed the interest of the State, as an employer,

in promoting the efficiency of the public services it performs through its employees.

*Tompos v. City of Taylor*, 644 F. App'x 678, 680 (6th Cir. 2016) (internal quotation marks omitted). The first two elements are "threshold" questions which, if answered in the affirmative, lead to the balancing test articulated in the third. *Miller v. City of Canton,* 319 F. App'x 411, 416 (6th Cir. 2009). While the determination of whether an employee's speech is protected or unprotected is often not an easy task, courts are counseled that, when a public employee speaks upon matters of only personal interest, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983).

The Plaintiff has identified the speech at issue in this case as falling into three categories: (1) complaints to school and state officials about Big Sandy's alleged violation of H.H.'s IEP, (2) answering parents' questions about the lack of special education services, and (3) arranging for the DCS to be contacted about child abuse the school was attempting to cover up. From a review of her affidavit, it appears the third category encompasses Caruthers' alleged prohibition against her reporting suspected child abuse to DCS directly; his refusal to pass on her reports of abuse to agency officials on at least two occasions; and his threat that, if she made reports to DCS, she would be fired. It is the position of the BCBOE that Hicks has not made the required showings to survive summary judgment on a First Amendment retaliation claim.

The Court will first address the question of whether Hicks' speech involved matters of public concern. For reasons explained in the following section of this opinion, the Court will consider in this discussion only Plaintiff's speech concerning the study guide.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S. Ct. at 2380 (internal quotation marks omitted). "[W]hether an employee's speech is protected as that of a citizen on a matter of public concern is a question of law to be determined by the content, form, and context of a given statement, as revealed by the whole record."[2] *Holbrook*, 2016 WL 4376428, at *4 (quoting *Connick*, 461 U.S. at 147-48 n.7) (internal quotation marks omitted). "In general, speech involves matters of public concern when it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003) (internal quotation marks omitted). "Even where an employee speaks out as a private citizen, [her] speech is not protected unless it related to a matter of public concern." *DeBrito v. City of St. Joseph*, 171 F. Supp. 3d 644, 651 (W.D. Mich. 2016), *appeal filed* (6th Cir. Mar. 24, 2016).

In support of summary judgment, the BCBOE maintains that the speech leading to any alleged retaliation against the Plaintiff consisted solely of her complaints about H.H.'s biology study guide, which were not a matter of public concern. The Court agrees to the extent these statements were not matters of public concern. To be sure, a school district's implementation of students' IEPs, or lack thereof, is likely to be of interest to the community at large. However, Hicks' complaints, both to local school officials and the state education agency, related only to the needs of a particular student -- *her* daughter -- and *her* IEP. There was no broader purpose.

---

[2]Although the question of whether an employee's speech is protected under *Pickering* is one of law, "[t]he jury may, however, resolve some underlying factual questions, which can inform the legal determination of the *Pickering* balancing." *Pucci v. Nineteenth Dist. Ct.*, 596 F. App'x 460, 470 (6th Cir. 2015).

Where the focus or point of the speech advances only a private interest, it is not a matter of public concern. *Farhat v. Jopke*, 370 F.3d 580, 592-93 (6th Cir. 2004); *see also Knaub v. Tulli*, 788 F. Supp. 2d 349, 356-57 (M.D. Pa. 2011) (special education teacher's advocacy on behalf of a friend's autistic child at an IEP meeting could not form the basis of a First Amendment retaliation claim because she was speaking on behalf of one child, not on a matter of public concern.). Accordingly, the Court finds Plaintiff's First Amendment retaliation claim based on her speech relative to H.H.'s study guide devoid of merit. With respect to this speech, then, the Court need not continue the *Pickering* analysis. *See Garcetti*, 547 U.S. at 418 (if the answer to the question whether the employee spoke on a matter of public concern is no, she has no First Amendment cause of action); *Crawford v. Columbus State Cmty. Coll.*, ___ F. Supp. 3d ___, 2016 WL 3670137, at *6 (S.D. Ohio July 11, 2016) (upon a finding that the plaintiff had not spoken on a matter of public concern, the court need not reach *Pickering's* balancing test).

As for the remaining categories of speech identified by Hicks as protected, the Court disagrees with the Defendant's characterization of the scope of the speech at issue in this case. Its attempt to narrow the subject matter of Plaintiff's speech to the study guide alone is belied by its own statement of material facts ("SMF").[3] The movant enumerated therein issues Caruthers had with Hicks, including her counseling of the South American student, who suffered suicidal

---

[3]The Court notes at this point that the SMF, contained within the memorandum in support of summary judgment, was filed in violation of the Local Rules. LR 56.1(a) directs that a motion for summary judgment "shall be accompanied by a *separate*, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." LR 56.1(a) (emphasis added). The rule further provides that "[m]emoranda in support of a motion for summary judgment shall not exceed 20 pages without prior Court approval" and "[t]he *separate* statement of material facts shall not exceed 10 pages without prior Court approval." *Id.* (emphasis added). The Court interprets the Local Rule to contemplate that the statement of material facts is to comprise a document separate from the motion and memorandum. Counsel is directed to file its statement of material facts as a separate document in future filings in this Court.

ideations, and his advice to Plaintiff that such counseling should be conducted by the school counselor. BCBOE stated in the subsequent SMFs, all citing to Caruthers' deposition, as follows:

14. Further, that student, upon turning 18, left her parents' home to live with Ms. Michelle Douglas, a teacher's aide. The parents believed the student was in an inappropriate relationship. The Plaintiff continued to "counsel" the student while informing the student's parents and other parents of the manner in which Michelle Douglas allowed the student to live in Ms. Douglas' home. Mr. Caruthers stated this created a hostile environment in the classroom for Michelle Douglas since the parent requested that Michelle Douglas be fired.

15. Plaintiff was directed at the beginning of the next year to "stop that kind of activity and don't go about getting information on students and stirring that information and creating some kind of issue at the school."

16. During the 2013/2014 school year, Mr. Caruthers had at least two meetings with the teacher's assistants, including the Plaintiff and Michelle Douglas.

17. Specifically, Mr. Caruthers told the teacher's aides, including the Plaintiff, to cease talking to parents of Special Education students with regard to what was going on in the building. It was his belief that there were continuing issues with the teacher's aides, specifically the Plaintiff, sharing information to other student's parents with regard to services provided to Special Education students.

18. Specifically, Mr. Caruthers believed that teacher aides in Special Education, including the Plaintiff, informed parents of Special Education students "your child is not being served."

19. Further, Mr. Caruthers, as well as expert Larry Greer, believed there were ongoing issues with regard to confidentiality regarding students and even more so Special Education students.

                              *        *        *

22. Mr. Caruthers states he would hear from parents that they heard from teacher's aides that certain services were not being provided to their child.

                              *        *        *

25.     Mr. Caruthers further believed that teacher aides, including the Plaintiff, had stated to parents that students had been taken out of all of their classes, and that it was an out of sight, out of mind mentality being told to the parents, which was not at all what occurred.

26.     Indeed, teacher aides, including the Plaintiff, made statements to parents regarding sensory equipment that was no longer located at Big Sandy School.  Teacher aides were informing parents that the Special Education students needed that equipment.

27.     He told the teacher's aides that they did not need to discuss the sensory equipment with the parents, and that it was the teachers, administrators, and supervisors who needed to address that issue.

28.     Mr. Caruthers advised the teacher's aides that he would ask for immediate termination if that type of communication continued.

                         *          *          *

30.     Mr. Caruthers wanted the teacher's aides to understand that going out and stating that students were not being served, whether Special Education or not, and bringing that into the building was not good for anyone.  Further, when he hears people in the community saying they want somebody fired from the building, those statements are not good.  When you had a co-worker believing you were using information you derived from a student against them, that is not good and it makes things within the building hard to deal with.

(*See* D.E. 64-1 at PageID 1895-97 (internal citations omitted).)

Based on the Court's recognition that Plaintiff's claims go beyond her speech in reference to the study guide, it will evaluate the second and third categories of speech for which Hicks claims she suffered retaliation.  The Court will assume this speech relates to matters of public concern.

Defendant argues that Hicks' statements included in the second category fell within the purview of her responsibilities as a special education teacher's aide, and, therefore, were unprotected.  In so doing, the BCBOE draws the Court's attention to *Garcetti*, in which the United States Supreme Court held that "when public employees make statements pursuant to

their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. The plaintiff in *Garcetti* was a calendar deputy in a local prosecutor's office whose official duties included advising his supervisor on how best to prosecute cases. *Id.* at 413-15. It was in the performance of these duties that he drew the ire leading to the retaliation from which his lawsuit arose. *Id.* In finding the plaintiff's speech did not come under the umbrella of the First Amendment, the Court distinguished the facts before it from those at issue in *Pickering*, in which it held that the plaintiff teacher's letter to the local newspaper criticizing the board of education's handling of proposed tax proposals for raising revenue for schools "had no official significance and bore similarities to letters submitted by numerous citizens every day." *Id.* at 422 (citing *Pickering*). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties[.]" *Lane*, 134 S. Ct. at 2379.

The courts in this Circuit have developed certain factors to be considered when deciding whether an employee's speech falls within her official duties. *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527 (6th Cir. 2015). These include "the impetus for [her] speech, the setting of [her] speech, the speech's audience, and its general subject matter." *Id.* (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)). "Other relevant, but not dispositive, factors include where the speech occurred -- inside or outside of the workplace -- and if the speech is ordinarily within the scope of the speaker's duties." *Id.* (internal citations omitted). "Speech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it owes its existence to [the speaker's] professional responsibilities." *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (internal quotation marks omitted); *see also Pucci v. Nineteenth Dist. Court*,

596 F. App'x 460, 468 (6th Cir. 2015) ("To establish whether a public employee is speaking as a citizen, we look to numerous indicia establishing the scope of the employee's professional duties, including *ad hoc* and *de facto* duties within the scope of the employee's official responsibilities.").

In asserting that her speech was not part of her official duties, Hicks points to SMF 21, which stated, "It was the policy of the school that if parents had a specific question regarding their child, it needed to go through the teacher, and the policy was told to the teacher's aides time and time again," citing to Caruthers' deposition testimony. (D.E. 64-1 at PageID 1896.) However, evidence and argument submitted by the Plaintiff in support of her claims in this action reflect that the policy was not followed during the 2013-14 school year.

Hicks submitted in her affidavit that

[b]ecause another teacher aide and [Hicks] were the only ones supervising the severely disabled students and making lesson plans for these students, when I was asked, I answered parents' questions truthfully concerning what was happening during the day with their children and what special education services their children were not receiving.

(D.E. 93 ¶ 9 at PageID 4319.) She further argued in her responses to the SMFs that Caruthers "ordered the special ed[ucation] aides to work alone without the supervision of a special ed[ucation] teacher and that if they could not do this, then his school was not the place they needed to be employed" (D.E. 89-1 at PageID 3734); that the teachers' aides "would go days without even seeing the special education teacher (*id.* at PageID 3735); and that "they rarely saw the special education teachers who [were] responsible for teaching and supervising these students" (*id.*), primarily because Carey Bell, who taught special education that year,[4] was not

---

[4]Bell apparently left Big Sandy after the 2013-14 term.

capable of fulfilling her duties. A portion of Chmelik's deposition testimony was also cited in Hicks' responses to the SMFs:

> Q: If a parent of a severely handicapped child comes in and the only person that's been with this child for a day or days at a time, who better to answer the question about what's going on in the classroom than that teacher's aide in that situation?
>
>            \*      \*      \*
>
> A: Oh, I'm sorry. I would hope that they – the paraprofessionals would go to the administrators and say that the special education was not – teacher was not doing her – her job under those circumstances. And when the paraprofessionals were asked questions –
>
> Q: In that situation?
>
> A: -- in that situation, you know, I – I can't imagine that they were asked IEP questions. I could see them answering questions that they were aware of.

(D.E. 90 at PageID 3787.)

The record evidence shows that, even if it was the policy at Big Sandy that the official duties of teachers' aides did not include answering questions posed by parents of special education students concerning what occurred in the classroom, their *de facto* duties did. Viewing the evidence in the light most favorable to the Plaintiff, the aides were often left alone with special education students for long periods of time and there was no one else to whom parents could pose their questions or concerns. Furthermore, the speech occurred on school property; the audience consisted of the parents of special education students; and the subject matter related to the classroom in which Hicks worked, her students, and her care of and association with those students during the school day in the performance of her job. "Ensuring that a classroom is well-supplied, safe, and conducive to learning and that the curriculum is substantively appropriate [] are quintessentially [responsibilities] of a teacher and a teacher's aide." *Felton v. Katonah Lewisboro Sch. Dist.*, No. 08 Civ. 9340(SCR), 2009 WL 2223853, at \*5 (S.D.N.Y. July 27,

2009). The Court finds that the Plaintiff's statements to parents concerning the special education program at Big Sandy were part of her official duties and, therefore, not protected by the First Amendment.

The Court now moves to the third category of allegedly protected speech – the complaint to DCS. Hicks stated in her affidavit that, after Caruthers refused to forward her reports of abuse to the agency and threatened to fire her, she alerted the Carl Perkins Child Abuse Center in west Tennessee and shared her concern about the abused student and the threat made to her. This speech, as that considered before it, does not support a First Amendment retaliation claim.

Even if the Court were to assume the Plaintiff has demonstrated that she engaged in protected conduct pursuant to the First Amendment and that she suffered an adverse employment action, she has failed to establish causation. As previously noted herein, in order to impose liability on the BCBOE for a § 1983 claim, the alleged unconstitutional act must have been a custom or policy of the municipality or perpetrated by a final policymaker. There is evidence in the record to support the conclusion that Florence, the final policymaker, was aware of Plaintiffs' speech involving her daughter's IEP and her statements to parents of special education children. While Caruthers knew a complaint was made to DCS and asked her if she was responsible, Plaintiff has offered no proof that he passed any suspicion he may have harbored regarding alleged wrongdoing by her relative to the report to the director of schools or to the BCBOE. Nor has she presented evidence that the Defendant or Florence was aware of threats made to Plaintiff by Caruthers regarding DCS reports. If any connection Hicks may have had with the complaint was unknown to the municipality or its final policymaker, it could not have been the moving force behind her nonrenewal.

In light of the foregoing, Plaintiff's First Amendment retaliation claims are DISMISSED.

## 2. The ADA and § 504

(a)     The Individuals with Disabilities Education Act ("IDEA") as the Sole Remedy for Plaintiff's Claims Asserted under the ADA and § 504, and Application of Its Requirement of Exhaustion of Administrative Remedies

As the local education agency, the BCBOE is required under the IDEA, 20 U.S.C. § 1400 *et seq.,* to "create an [IEP] for . . . disabled students." *F.H. ex rel. Hall v. Memphis City Schs.*, 764 F.3d 638, 641 (6th Cir. 2014). The statute "guarantees these children a Free Appropriate Public Education ("FAPE") . . . in conformity with the IEP." and "provides specific procedural recourse should an involved party object to the construction or implementation of the IEP." *Id.* The Defendant argues that Plaintiff brought her claims under the ADA and § 504 in error, as they are in fact governed by the IDEA, which provides the sole remedy.

In doing so, the movant relies upon the United States Supreme Court's holding in *Smith v. Robinson*, 468 U.S. 992 (1984), that the Education of the Handicapped Act, the predecessor statute to the IDEA, constituted the exclusive remedy for defending a student's right to a FAPE. *Smith*, 468 U.S. at 1009. Subsequent to the decision, Congress amended the statute to include the following provision:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*) (internal citations omitted). The stated purpose of the amendment was, in part, to "clarify the effect of the [statute] on rights, procedures, and remedies under other laws relating to the prohibition of discrimination, and for other purposes." Handicapped Children's Protection Act of 1986, Pub. L. No. 99-372, 100 Stat. 796 (1986). Courts have construed the

language of § 1415(*l*) as overruling *Smith.  See Chuhran v. Walled Lake Consol. Schs.*, No. 93-2621, 1995 WL 138882, at *2 & n.3 (6th Cir. Mar. 28, 1995) (per curiam); *L.H. v. Hamilton Cty. Dep't of Educ.*, No. 1:14-CV-00126, 2015 WL 1926226, at *2 (E.D. Tenn. Apr. 27, 2015); *B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-cv-293, 2009 WL 277051, at *5 (W.D. Mich. Feb. 2, 2009).

As set forth above, § 1415(*l*) mandates that the IDEA's statutory procedures be exhausted when a plaintiff seeks relief available under the IDEA but sues under another statute.  *See* 20 U.S.C. § 1415(*l*); *Fry v. Napoleon Cmty. Schs.*, 788 F.3d 622, 625 (6th Cir. 2015), *cert. granted*, 136 S. Ct. 2540 (U.S. June 28, 2016).  "This language requires exhaustion when the injuries alleged can be remedied through IDEA procedures, or when the injuries relate to the specific substantive protections of the IDEA."  *Fry*, 788 F.3d at 625 (citing *S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008)).  Plaintiff submits the IDEA's exhaustion requirement has no application in this case, in which she claims retaliation for advocating for disabled students at Big Sandy, because she does not seek remedies under the statute.

Even where the IDEA's exhaustion requirement applies, a plaintiff need not pursue her administrative remedies if to do so "would be futile or inadequate to protect the plaintiff's rights."  *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000).  "The burden of demonstrating futility or inadequacy rests on the party seeking to bypass the administrative procedures."  *Id.*  "[W]hen a plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required."  *S.E.*, 544 F.3d at 642.

While concerns voiced by Hicks to school officials focused in part on the implementation of H.H.'s IEP, the gravamen of her suit in this Court is clearly the loss of her job because of her

complaints. Thus, it cannot be said that her claims are "initially best addressed by educational professionals through the administrative process" provided under the IDEA. *Id.* at 642-43. This interpretation is bolstered by the fact that she did not bring this action on behalf of her daughter. The Court finds that, as the actions complained of here were noneducational, the Plaintiff was not required to exhaust her remedies under the IDEA. *See C.G. v. Cheatham Cty. Bd. of Educ.*, No. 3-14-2309, 2015 WL 3603861, at *1-2 (M.D. Tenn. June 5, 2015) (parents of child with a peanut allergy attempted to obtain an accommodation from the school to address the allergy and school officials retaliated against them by, among other things, making a false report to the state department of human services alleging severe abuse of the child by his parents; in subsequent ADA and § 504 action, parents were not required to exhaust IDEA remedies because their complaint centered around retaliation for advocating for children with allergies, not an educational placement); *M. A. v. N.Y. Dep't of Educ.*, 1 F. Supp. 3d 125, 144-46 (S.D.N.Y. 2014) (magistrate judge did not err in declining to apply IDEA's exhaustion requirement to parent's noneducational ADA claim that school officials retaliated against her for her advocacy by physically and emotionally abusing her special education child, as "physical and emotional abuse by school district personnel does not constitute the type of educational deficiency that the IDEA is intended to address, but rather is a completely separate actionable wrong; thus, parent was not required to exhaust the IDEA's administrative remedies); *Sagan v. Sumner Cty. Bd. of Educ.*, 726 F. Supp. 2d 868, 882-83 (M.D. Tenn. 2010) (where parents' "claims concern[ed] the alleged unlawful and unreasonable use of force, as well as the alleged negligence of the [board of education] in failing to detect or prevent the abuse allegedly perpetrated by [a teacher against their child,] [t]he [c]ourt construe[d] these claims as arising from non[]educational injuries,

irrespective of the fact that they occurred in an educational setting and were allegedly perpetrated by educators against a student[,]" and exhaustion was not required).

The Defendant's motion for summary judgment as to Hicks' ADA and § 504 claims on exhaustion grounds is DENIED. Based on the Court's ruling that Plaintiff need not exhaust these claims in accordance with IDEA procedures, the Court will at this point turn to their merits.

(b)     Merits of the ADA and § 504 Claims

The ADA forbids discrimination "against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a); *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015). The statute further prohibits discrimination, or retaliation, "against any individual because such individual has opposed any act or practice made unlawful by" the statute. 42 U.S.C. § 12203(a); *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 696-97 (6th Cir. 2013). Section 504 contains similar provisions. *See* 29 U.S.C. § 794(a); 29 C.F.R. § 33.13; *A.C. ex rel. J.C.*, 711 F.3d at 696-97. Because they are generally similar in scope and purpose, decisions analyzing either statute are applicable to both. *A.C. ex rel. J.C.*, 711 F.3d at 697; *see also* 29 U.S.C. § 794(d).

In proving a violation of these statutes, a plaintiff may utilize direct or circumstantial evidence. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (quoting *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011)) (internal quotation marks omitted), *reh'g en banc denied* (Oct. 28, 2016). Stated differently, "direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus." *Id.* (alteration omitted). Such evidence "explains itself" and "does not

require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor." *Gohl*, 836 F.3d at 683. "[I]f the evidence requires the jury to infer some further fact, it is not direct evidence." *Tilley v. Kalamazoo Cty. Rd. Comm'n*, ___ F. App'x ___, 2016 WL 3595715, at *6 (6th Cir. June 27, 2016) (quoting *Chandler v. Specialty Tires of Am. (Tenn.), Inc.,* 134 F. App'x 921, 927 (6th Cir. 2005)). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . satisfy this criteria." *Sharp v. Aker Plant Servs. Group, Inc.*, 726 F.3d 789, 798 (6th Cir. 2013). "Once a plaintiff demonstrates direct evidence of discrimination, the burden of persuasion then shifts to the defendant to show that it would have taken the adverse employment action absent the discriminatory motive." *O'Donnell,* 838 F.3d at 725 (internal alterations & quotation marks omitted).

If the plaintiff relies on indirect, circumstantial evidence, however, the court is to analyze the claim based on the familiar burden-shifting paradigm articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). "The plaintiff must first establish, by a preponderance of the evidence, that (1) she "engaged in a protected activity"; (2) she "suffered an adverse employment action"; and (3) there was "a causal link between the protected activity and the adverse employment action." *Neely v. Benchmark Family Servs.,* 640 F. App'x 429, 437 (6th Cir. 2016); *Ford Motor Co.*, 782 F.3d at 767. That is, "but for an employee's statutorily protected activity the employer would not have taken the adverse employment action." *Ford Motor Co.*, 782 F.3d at 767 (internal quotation marks omitted). The bar for demonstrating the prima facie case is a low one. *Rorrer*, 743 F.3d at 1046. If the plaintiff establishes a prima facie case, "the defendant has a burden of production to articulate a nondiscriminatory reason for its action." *Ford Motor Co.*, 782 F.3d at 767 (internal

emphasis omitted). "If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation." *Id.*

Defendant submits that summary judgment is appropriate because Hicks has failed to come forth with circumstantial evidence sufficient to survive the *McDonnell Douglas* analysis. In response, Plaintiff argues that she need not rely on circumstantial evidence because direct evidence establishes her ADA and § 504 claims.

> When an employer acknowledges that it relied upon the plaintiff's [protected activity] in making its employment decision, the *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant and the plaintiff has direct evidence of [retaliation] on the basis of his or her [protected activity].

*Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016) (internal alterations & quotation marks omitted).

Specifically, Hicks points to her responses to the BCBOE's SMFs numbered ten and forty-three as referencing direct evidence of retaliation. These SMFs stated that, "[d]uring the 2013[-14] school year, [Caruthers] had issues with the Plaintiff and a fellow teacher's aide, Michelle Douglas" (D.E. 64-1 at PageID 1894) and "[t]he reason for not rehiring the Plaintiff was that rehire was not in the best interest of the school system" (*id.* at PageID 1898). These facts, the nonmovant asserts, consist primarily of Caruthers' deposition testimony that she "stirred up trouble" by advocating for disabled children.[5]

In his deposition, Caruthers stated that one of the incidents contributing to his recommendation for Plaintiff's termination concerned the DCS complaint. According to the principal,

---

[5]With respect to the ADA and § 504 claims, which are not brought pursuant to § 1983, the Defendant has not taken issue with the Plaintiff's use of actions by Caruthers to bind the BCBOE.

> [t]he DCS worker had some information that had been called in in regards to a student. They had specific information actually in regards to his day-to-day care. The case worker told us that that information had to have come from the school because they had day-to-day information regarding this student.

(D.E. 65-7 at PageID 2511.) He described "day-to-day information" as "[f]or instance, like the student came to school today, nails were dirty, hadn't been trimmed. Student came to school this morning, ate five breakfasts. Student came to school this morning, dirty diaper. Student came to school this morning, hadn't been bathed over the weekend." (*Id.* at PageID 2511-12.)

While Caruthers asked Hicks if she provided information to DCS and she denied having done so, he concluded that an individual who worked with the student gave the information to someone who then contacted DCS. The parents of the student, an older, very high-needs child, were upset by the report and it was Caruthers' opinion that it need not have been made under the circumstances.

In another instance, Hicks was left as the immediate caregiver of a different high-needs student after the parent, Larry Heck, requested that Douglas provide exclusively for his care. The request stemmed from a fall the child took from a stool in the cafeteria, which required stitches, and was lodged by Mr. Heck to Caruthers in April or May 2013. A second incident occurred when the Plaintiff was moving the boy around the room and he fell, breaking a tooth.

Caruthers also referred to the South American student, stating

> [t]here was a connection between Ms. Casey and this child's parents, and on more than one occasion Ms. Hicks had been told, Hey, you need to really be careful about counseling this student. This student at more than one occasion at school had been suicidal, would be a – had even threatened those things. So it was to the point that, hey, any kind of issues, that the school counselor needs to be the person that deals with the student.

(*Id.* at PageID 2526.)  The principal suspected Hicks gave the parents information that Douglas knew of inappropriate activities that had occurred between their daughter and her boyfriend.  He explained:

> . . . I think the issue was this:  We're co-workers.  Ms. Casey is providing this counseling over here on the side to the student and then at the same time letting parents know information that – in regards to Ms. Michelle.  They're co-workers in the building.
>
> \*       \*       \*
>
> And then as the principal I have these parents coming, demanding that I have a – personnel in my building that knows about some kind of inappropriate activities, which – whether those things occurred or not, I don't know.  I turned that information over to my resource officer who determined there was not any kind of inappropriate activities.  There wasn't enough age discrepancy between the students.  Whatever happened, the parent is just as responsible as the student if they're allowing those type of activities to occur.
>
> \*       \*       \*
>
> . . .  The only thing I know is it was creating a hostile environment when I'm in this classroom and I'm working with students and you're in this classroom working with students, and the student that I've just been counseling with or in the last few weeks or months their parents are in the principal's office and asking the other person that's in the room [Douglas] get fired.
>
> \*       \*
>
> . . . Ms. Hicks was told the beginning of the next school year, Stop this kind of activity, Don't go about getting information on students and then stirring that information and creating some kind of issue at school.  Stop it.

(*Id.* at PageID 2528-30.)

Caruthers stated in his deposition that changes had been made in the special education program at the beginning of the 2013-14 school year, upon the hiring of Bell, that involved removing students from the classroom they had been in because it required that diaper changes and similar hygiene activities be conducted in the teachers' lounge.  The students were moved to a classroom in the elementary portion of the school building that had its own restroom.  In

meetings during the school term, the principal chastised the teacher's aides about telling parents their children were being "cooped up" in the room all day and not being served, when it was not true. (*Id.* at PageID 2535.) He also objected to the aides answering questions that should have been directed to the special education teacher and/or school officials, including inquiries relative to the sensory equipment that had been removed from the school by Bell's predecessor, Sarah Comuzie.

The principal further cited to a meeting attended by the Hickses, Douglas and another parent of a special education student to present their concerns to Chmelik. Caruthers had the impression that the parents of the other student had been provided with information to make them believe their child was not being properly served. He did not think the Plaintiff set up the meeting but did believe she helped make it happen.

When asked what "stirring up" trouble meant with respect to his recommendation to Florence that Hicks not be renewed, Caruthers testified as follows:

> Well, when I said that, it wasn't about her daughter. I want that to be clear about that information. I would expect any parent to go to beyond whatever they need to do to make sure that their child is being provided for. I have four daughters. I would go through the door back and forth as many times as possible to make sure they're being taken care of. I would expect the same thing from Ms. Hicks or Mr. Hicks, either one.
>
> However, the constant of sharing information outside . . . . That could not continue to go on, toppled [sic] with the fact that the primary student that she was about half her day responsible for taking care of, that parent had requested that she no longer serve his child. In my building that limited me to where I could put Ms. Hicks and –

(*Id.* at PageID 2576.) He viewed the "sharing" of information as a violation of confidentiality.

This proof, in the Court's view, falls short of being the smoking gun suggested by the Plaintiff. A reasonable jury could find that Caruthers recommended nonrenewal because he believed her complaints about the study guide were unfounded, she had been less than

forthcoming with him about her involvement with the DCS report and the parent meeting, and she had a tendency to overreaction and gossip. As the evidence presented would require the finder of fact to draw inferences in order to reach the conclusion that unlawful retaliation was at least a motivating factor in the nonrenewal of her position, it does not constitute direct evidence of retaliation. *Compare Clark v. Walgreen Co.*, 424 F. App'x 467, 472 (6th Cir. 2011) (employer's statement that "because of your health, we're just going to go ahead and terminate you" was not direct evidence that plaintiff was fired in connection with his leave; rather, comments appeared to address his post-leave job performance as a function of his health) (per curiam) *with Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (where defendant decided to fire employee immediately after employee advised him in a phone call of his intention to file a lawsuit, his belief that the employer was creating a hostile work environment and his plan to respond to a warning letter with charges, after which employer told others he was not optimistic about the employee's ability to change his behavior *based on those statements*, direct evidence existed from which a reasonable jury could conclude termination resulted from protected statements made by employee).

Accordingly, the Court proceeds to consider Hicks' circumstantial evidence of retaliation. The Defendant maintains that the Plaintiff has failed to demonstrate the first, third and fourth elements of the prima facie case.[6]

The first element, protected activity, "typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Rorrer*, 743 F.3d at 1046. "A special education teacher must do more than merely assist her disabled students in order for there to be protected activity."

---

[6]The BCBOE concedes, for purposes of summary judgment, that it was aware of Hicks' complaints about the study guide. There is also evidence in the record that certain district officials were aware of her statements about the special education program and/or complaint to DCS.

*Brooks v. Capistrano United Sch. Dist.*, 1 F. Supp. 3d 1029, 1036 (C.D. Cal. 2014). Instead, a teacher must "advocate on behalf of her disabled students or protest discrimination perpetrated on them by others." *Id.*; *see also Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.,* 595 F.3d 1126, 1132 (10th Cir. 2010) ("attempting to protect the rights of special education students constitutes protected activity under the Rehabilitation Act"); *Montanye s. Wissahickon Sch. Dist.*, 218 F. App'x 126, 131 (3d Cir. 2007) (while "mere assistance to special education students" is not protected, "affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others" constitutes protected activity); *Rhodes v. Tuscaloosa Cty. Bd. of Educ.*, 935 F. Supp. 3d 1226, 1253-54 (N.D. Ala. 2013) (school district employee's advocacy for disabled son protected activity in ADA retaliation claim); *DeCotiis v. Whittemore*, 842 F. Supp. 2d 354, 371-72 (D. Me. 2012) (plaintiff stated claim for § 504 retaliation where it was alleged that her employment contract was not renewed because she advocated for disabled children who were receiving insufficient services from school district). The Court finds that Plaintiff has at least raised a question of fact as to whether she engaged in protected activity.

The Defendant contends that Plaintiff did not suffer an adverse action, arguing that it did not terminate her, but merely decided not to renew a year-to-year employee for the following school term. To be adverse in the context of an ADA or § 504 retaliation claim, the "action must be enough to dissuade a reasonable person from engaging in the protected activity." *A.C. ex rel J.C.,* 711 F.3d at 698. This Court is of the opinion that a reasonable jury could conclude that the spectre of not being rehired would dissuade a reasonable person from engaging in the protected activity at issue in this case.[7] Accordingly, viewing the facts in the light most favorable to Hicks, summary judgment is not warranted on this ground. *Hurtt v. Int'l Servs., Inc.,* 627 F. App'x 414,

---

[7]Caruthers stated in his deposition that a failure to rehire for the following term was school system speak for termination.

423 (6th Cir. 2015) (where plaintiff produced evidence at summary judgment stage that he had been constructively discharged, court found that a reasonable finder of fact could conclude that such action would dissuade a reasonable person from engaging in protected activity).

Finally, the BCBOE submits that, as there was neither protected activity nor an adverse action, there was no causal connection to be made that would establish a prima facie case of retaliation. "[A] causal connection is established when the plaintiff proffers evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Kirkland v. James*, ___ F. App'x ___, 2016 WL 6520068, at *4 (6th Cir. Nov. 3, 2016) (internal alterations & quotation marks omitted). At this point in the proceedings, the plaintiff must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity . . . sufficient to allow an inference that the adverse action would not have been taken had the plaintiff not engaged in protected activity." *A.C. ex rel J.C.*, 711 F.3d at 699 (internal citations & quotation marks omitted). "Temporal proximity can often help meet this causal burden and where the adverse action comes very close in time after the exercise of protected activity, such temporal proximity is significant enough to meet the burden alone." *Id.* (internal citations & quotation marks omitted). The Sixth Circuit recently reiterated that "[t]emporal proximity of more than six months, standing alone, has not been found to support an inference of retaliatory discrimination absent other compelling evidence." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 309 (6th Cir. 2016).

Hicks has proffered evidence that she spoke out about problems in the special education program throughout at least the 2013-14 school term, at the end of which she was not renewed for the following school year. In addition, she points to Caruthers' deposition testimony that Douglas, whose employment was renewed for the 2014-15 academic year, stopped the "pot-

stirring type mentality" when he told her to, while Hicks did not.  The Court finds that this evidence is sufficient to meet Hicks' minimal burden to put forth evidence permitting a reasonable inference of causation.

At this juncture, it is incumbent on the BCBOE to come forth with a legitimate nondiscriminatory reason for not renewing Plaintiff's position as a teacher's aide.  According to the Defendant, the basis for Caruthers' recommendation, accepted by the BCBOE, consisted of Hicks' involvement in the issue with the South American student and statements made to the parents of special education students relative to the program, as well as the principal's determination that he no longer had a placement for Hicks based on Mr. Heck's request that only Douglas care for his son.  In its brief, the BCBOE asserted that

> [d]ue to the fact that this parent requested that the other teacher's aide become that student's full-time caregiver, it limited Mr. Caruthers where he could place the Plaintiff in his building.  Mr. Caruthers did not have a place to put the Plaintiff after the parent stated that he no longer wanted the Plaintiff working with his child.

(D.E. 64-1 at PageID 1906 (internal citation omitted).)

The Plaintiff maintains that these reasons are mere pretext for retaliation.  To survive a motion for summary judgment, Hicks need prove "only enough to create a *genuine issue* as to whether the rationale was pretextual."  *Whitfield v. Tenn.,* 639 F.3d 253, 260 (6th Cir. 2011).  In evaluating pretext, the "court should consider all probative evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage."  *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (internal alteration omitted).

Hicks argues that the finder of fact may infer the "turmoil" and trouble cited by Caruthers as a reason for her nonrenewal arose from her advocacy for disabled students.  The Court,

viewing the evidence presented in the light most favorable to the nonmovant and considering the

evidence discussed previously with respect to the prima facie case, agrees.

She also maintains that the BCBOE's reason concerning placement is inconsistent with

Caruthers' deposition testimony, in which he stated as follows:

> Q: Mr. Caruthers, . . . [i]f the only thing – if the only thing that Casey Hicks
> had done in your book that was wrong had been the fact that Mr. Heck
> came in and asked for her not to be the aide, would that have been enough
> to terminate her in and of itself?
>
> A: Had Mr. Heck only – if that would have been the only thing?
>
> Q: Right.  And she had not been stirring up the trouble.
>
> A: No, I don't think so.
>
> Q: It wouldn't have been enough?
>
> A: No, it would not have.
>
> Q: If the stirring up the trouble had been the only thing that Casey Hicks had
> done and there wouldn't have been the Larry Heck issue, would that have
> been enough to terminate her?
>
> A: If it would have continued to repeat itself.
>
> Q: After the fall semester?
>
> A: You know, I guess I would leave that up to the director of schools, but I
> would have made sure that he was aware that even though we had said you
> need to stop this stirring up of trouble, spreading information –
>
> Q: Well, let me ask it this way.  May 16th, when she was not renewed, or
> May 1 when you sent the letter over, had Larry Heck not allegedly said, I
> don't want Casey Hicks to be the aide for my child anymore, if that had
> not happened, would you have still sent the letter over and recommended
> for Casey Hicks not to be rehired?
>
> A: That would have just had a discussion at that time with the director.
>
> Q: Well, I'm asking would you have recommended it?

A:      You know, I want to think in hindsight now that I would have continued to
        try to work with Ms. Casey. . . .

Q:      So you're not sure if you would have terminated her or not?

A:      I want to think that wouldn't have been the case . . .

(D.E. 65-7 at PageID 2600-01.)

A reasonable jury could conclude that this evidence indicates that even the principal who recommended Hicks not be renewed did not believe the Heck issue was sufficient to warrant the adverse action, calling into question one of the Defendant's stated reasons for the nonrenewal. *See O'Donnell*, 838 F.3d at 727 (a plaintiff may demonstrate pretext by showing the defendant's proffered reason "was insufficient to warrant the challenged conduct.").

Based on the foregoing, the Court finds that Hicks has created a genuine issue as to whether the rationale offered by the BCBOE was pretextual. Consequently, the Defendant's motion for summary judgment on the ADA and § 504 claims is DENIED.

## B.  State Claim

Plaintiff has alleged a state law claim of violation of the TPPA, which prohibits employers from discharging or terminating an employee for "refusing to participate in, or refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). To demonstrate a claim for retaliation under the statute, commonly known as the "Whistleblower Act," a plaintiff must show "(1) [her] status as an employee of the defendant; (2) [her] refusal to participate in, or remain silent about, illegal activities; (3) [her] termination; and (4) an exclusive causal relationship between the refusal to participate in, or remain silent about, illegal activities and [her] termination." *Amos v. McNairy Cty.*, 622 F. App'x 529, 536 (6th Cir. 2015). "Illegal activities" are defined in the statute as "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety

or welfare." Tenn. Code Ann. § 50-1-304(a)(3).  With respect to the fourth element of the claim, the plaintiff "must demonstrate that [her] whistleblowing behavior was the *sole* reason for [her] termination."  *Amos,* 622 F. App'x at 536.  The burden of making this showing has been described as "formidable."  *Wheeler v. Jackson Nat'l Life Ins. Co.*, 159 F. Supp. 3d 828, 861 (M.D. Tenn. 2016).

The statute's protection "extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated . . ."  *Richmond v. Vanguard Healthcare Servs., LLC*, No. M2014-02461-COA-R3-CV, 2016 WL 373279, at *6 (Tenn. Ct. App. Jan. 29, 2016) (quoting *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997)) (emphasis omitted).  The plaintiff must "identify the law and policy that [she] contends was contravened." *Id.* at *7.  She must also establish that she reported the activity and that the reporting "furthered a clear public policy."  *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 38 (Tenn. 2015); *see also Bennett v. Highland Graphics, Inc.*, No. 3:14-cv-02408, 2016 WL 6071998, at *13 (M.D. Tenn. Oct. 17, 2016) (same).

In support of her claim, Hicks points to the DCS report and her complaints about H.H.'s study guide.  She also argues that she "refused to remain silent when parents of the severely disabled students she cared for asked her questions with regard to the failure of their children to receive special education services."  (D.E. 89 at PageID 3723.)  As for Big Sandy's alleged violation of H.H.'s IEP, Hicks cites to 20 U.S.C. § 1414(d), which requires school districts to develop IEPs for children with disabilities, and 20 U.S.C. § 1415(a), which mandates that states "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]."  She also refers to Tennessee Code Annotated §§ 49-10-101 through 1203, consisting of Parts 1 through 12 of

the state's special education legislation. First, the Plaintiff has pointed the Court to no specific portion of the IDEA violated by the Defendant. Secondly, citation to almost an entire chapter of the Tennessee Code does not, in this Court's view, comply with the Tennessee courts' instruction to plaintiffs to "identify the law and policy" allegedly contravened. While it is not suggesting that laws do not exist prohibiting the acts alleged, it is simply not the Court's duty to ferret them out.

Hicks' statements relative to inadequacies in the special education program that she shared with parents likewise fall short of supporting a TPPA claim. In *Haynes*, the Tennessee Supreme Court found that "imposing liability for the discharge of a whistleblower is a narrow exception to the employment-at-will doctrine and must be limited to situations in which an employee has exposed the wrongful conduct of the employer in furtherance of the public interest, which may require reporting to an outside agency in circumstances" where internal reporting would be ineffective, such as where the wrongdoer was the manager, owner or highest authority in the organization. *Haynes,* 463 S.W.3d at 40-41. The court recognized there was no "bright-line rule" concerning the outside entities to which an employee may report in order to state a claim under the statute, citing cases in which reports were made to "various different authorities," including the Tennessee Department of Commerce and Insurance, the Board of Law Examiners, and local fire and police departments. *Id.* at 37 n.4. The Plaintiff has pointed the Court to no caselaw, however, supporting the view that statements made to members of the general public rise to the level of the "reporting" required by the statute.

In connection with the DCS report, Plaintiff refers the Court to Tennessee Code Annotated § 37-1-403, which requires any person with knowledge of a child suffering from abuse to report it immediately. Tenn. Code Ann. § 37-1-403(a)(1). The failure of this claim lies

in the causation requirement, which mandates that the *whistleblowing activity* be the *sole* reason for the employee's discharge. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535-36 (Tenn. 2002) ("Under the statute, the plaintiff must demonstrate an exclusive causal relationship between his whistleblowing activity and his subsequent discharge."). Hicks has alleged that her employment was not renewed for reasons that cannot be considered whistleblowing activity for purposes of the TPPA, i.e., her statements to parents. Accordingly, the Court finds that her whistleblowing activity in the form of the DCS report cannot be said to be the sole reason for her termination. The TPPA claim is DISMISSED.

## V. CONCLUSION

Based on the foregoing, the Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Specifically, the Plaintiff's First Amendment retaliation claim is DISMISSED. Hicks must, within ten days of the entry of this order, advise the Court as to whether she intends to pursue her First Amendment prior restraint claim. The state law claim is also DISMISSED. The Plaintiff's claims under the ADA and § 504 will proceed to trial.

IT IS SO ORDERED this 1st day of December 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE